**ALLSTATE INSURANCE COMPANY, Plaintiff,**

v.

**Norman C. SHOCKLEY, Edith Edna Shockley, DeWayne DesJarlais, Karen DesJarlais, Jennifer Kay DesJarlais, Joseph Keith DesJarlais, and Jacob Kyle DesJarlais, Defendants.**

**No. IP 90–1595–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Nov. 19, 1991.

John W. Hammel, Yarling Robinson Hammel & Lamb, Indianapolis, Ind., for plaintiff.

L. Craig Turner, Boberschmidt Miller O'Bryan & Turner, Indianapolis, Ind., for defendant Norman C. Shockley.

---

Michael T. Conway, Allen Baratz Conway & Hammerle, Indianapolis, Ind., for defendant Edith Edna Shockley.

Frederick W. Crow, Young & Young, Indianapolis, Ind., for defendants DeWayne DesJarlais and Karen DesJarlais.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This cause comes before the Court on the motion of plaintiff Allstate Insurance Company ("Allstate") for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. All the defendants have responded to the motion, and Allstate has timely replied, so the issues are ready for resolution. For the reasons discussed below, the Court now GRANTS Allstate's motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The key facts in this case are undisputed. Allstate is a corporation duly organized and existing under the laws of the State of Illinois, with its principal place of business in Northbrook, Illinois. Defendant Norman C. Shockley ("Norman") is a citizen and permanent resident of Indiana, and is presently incarcerated at the Indiana State Farm in Greencastle, Indiana. Defendant Edith Edna Shockley ("Edith"), Norman's mother, is a citizen and resident of Indianapolis, Indiana. The remaining defendants—DeWayne DesJarlais ("DeWayne"), his wife Karen DesJarlais ("Karen"), and their children Jennifer Kay DesJarlais ("Jennifer")[1], Joseph Keith DesJarlais ("Joseph"), and Jacob Kyle DesJarlais ("Jacob")—all are Indiana citizens residing in Indianapolis. DeWayne is Edith's nephew and Norman's cousin, which makes Edith the great aunt of Jennifer, Joseph, and Jacob. The amount in controversy, exclusive of interest and costs, exceeds $50,000.

Allstate issued Edith a homeowners' insurance policy, which was in effect during the period of April 28, 1987 to April 28, 1988, for her residence at 3465 East Sixth Avenue in Indianapolis. This policy provided, among other things, coverage for liability and medical expenses in Part II, Coverage X ("Family Liability Protection") and Coverage Y ("Guest Medical Protection"). Allstate agreed under terms of the liability coverage to pay all sums which an "insured person" became legally obligated to pay because of "bodily injury" or property damage, to the extent that such claims were covered by the policy. In addition, Allstate agreed to defend an insured person against claims which were covered by the policy, and maintained the right to settle or compromise such claims.

The policy contained the following definitions:

3. "Insured person"—means you and, if a resident of your household:

a) any relative; and

b) any dependant person in your care....

4. "Bodily injury"—means bodily injury, sickness or disease, including required care, loss of services and resulting death.

The policy also contained several pertinent exclusions. Liability coverage did not reach "any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person," nor did it cover "bodily injury to an insured person or property damage to property owned by an insured person." Medical expense coverage did not apply to "any bodily injury which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person," nor to "bodily injury to any insured person or regular resident of the insured premises."

In November 1987, DeWayne and Karen moved with their children from Indianapolis to California, where they moved in with Karen's mother. After some three weeks,

---

**1.** Jennifer actually was Karen's stepdaughter, having been born to DeWayne in a previous marriage, but it is undisputed that she had re- sided with DeWayne and Karen since shortly after her birth.

it became apparent that Karen's mother and the DesJarlais children could not get along, so DeWayne and Karen were forced to make other arrangements. In mid-December 1987, DeWayne and Karen contacted Edith, who agreed to take care of Jennifer (age five at the time), Joseph (age two), and Jacob (less than one year old) until DeWayne and Karen could find employment, sell their home in Indianapolis, and buy a new home in California. With the exception of these general parameters, there was no predetermined length of time for the children's stay with Edith.

According to her agreement with DeWayne and Karen, Edith was to take physical custody of the Jennifer, Joseph, and Jacob, look after them, care for them, feed them, make sure they had medical attention, and perform "general parenting duties." DeWayne and Karen agreed to pay Edith a sum of money each week to defray the cost of the children's food, clothing, diapers, and medical care, and to compensate Edith for her care of the children. They also authorized Edith to obtain medical care or treatment for the children, if needed.

Shortly after talking with DeWayne and Karen, Edith flew to California and took the children back with her to Indianapolis. Edith paid her own fare to and from California, and also paid the children's fares to Indianapolis. DeWayne and Karen did not reimburse Edith for this expense. Jennifer, Joseph, and Jacob lived with Edith in her household, under her sole care and in her physical custody, for approximately eight weeks, from mid-December 1987 until February 10, 1988.

On February 10, Jennifer appeared to be ill, and Edith took her to Wishard Memorial Hospital for treatment. As a result of her examination there, Jennifer was removed from Edith's care and was transferred to the Marion County Children's Guardian Home. Within a few days, Joseph and Jacob were also removed from Edith's care by other relatives of DeWayne and Karen. Beginning on February 10, and over the next few days, DeWayne and Karen were informed that Jennifer had been molested and sexually abused. As a result, they returned to Indianapolis on February 14 or 15, 1988, reacquiring physical custody of the children and returning to their house in Indianapolis.

The incident with Jennifer prompted an investigation that culminated in Norman Shockley's arrest in December 1988, on charges that he molested Jennifer while she lived with Edith. After further investigation, Norman was arrested again in March 1989, on charges that he had also molested Joseph and Jacob during the same period. At a hearing on June 14, 1989, Norman pled guilty to seven counts of child molestation. The court accepted Norman's pleas, determining that they were made knowingly, intelligently, and voluntarily, and found that the facts alleged in each count of child molestation were true. On July 19, 1989, the court found Norman guilty but mentally ill on each count and sentenced him to eight years in prison. On November 14, 1989, DeWayne and Karen initiated an action for damages against Edith in Marion County Superior Court, Marion County, Indiana, alleging that Edith's negligent supervision led to Norman's molestation of their children. The DesJarlaises later added Norman as a defendant.

Allstate initiated the present declaratory judgment action on July 16, 1990. Allstate seeks a declaration from this Court that it is not liable under the homeowner's policy issued to Edith either to provide a defense for Edith and/or Norman, or to satisfy any judgment that might be levied against them, in any civil action arising from Norman's molestation of the DesJarlais children from December 1987 to February 10, 1988. In support of its position, Allstate makes the following assertions: (1) that Jennifer, Joseph, and Jacob were "insured persons" as defined in the policy, because they were relatives of Edith and were residents of her household, so that her policy does not cover any injuries to them; (2) that the molestations committed by Norman constituted "intentional or criminal acts" by an insured person, which are excluded from coverage; (3) that the molestations are not "bodily injuries" as defined by

the policy, so that they are not covered; and (4) that Edith's coverage under the policy was cut off, because she failed to notify Allstate in a timely manner of the DesJarlaises's potential claims against her.

On June 14, 1991, Allstate moved for summary judgment, relying on the first two grounds enumerated in its complaint. The defendants, in separate responses, have conceded that any claims by the Des-Jarlaises against Norman cannot lead to recovery under Edith's policy, due to the intentional or criminal act exclusion. The defendants, however, deny that Jennifer, Joseph, and Jacob were residents of Edith's household at any time.

## II. SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure. Rule 56(c) provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). As stated in *Celotex*, summary judgment is not a disfavored procedural shortcut, but rather is an intregal part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2554. Decisions of the Seventh Circuit are in conformity with this view. *See, e.g., Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir. 1990); *Spellman v. Commissioner*, 845 F.2d 148, 151–52 (7th Cir.1988).

▪ Moreover, the mere existence of a factual dispute is not by itself sufficient to bar summary judgment; the disputed fact must be outcome determinative. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *International Bhd. of Boilermakers v. Local D354*, 897 F.2d 1400, 1406 (7th Cir.1990). The party opposing a motion for summary judgment bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991); *Harris v. City of Zion*, 927 F.2d 1401, 1407 (7th Cir.1991). Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Clampitt v. Ft. Wayne*, 682 F.Supp. 401 (N.D.Ind.1988), *aff'd*, 864 F.2d 486 (7th Cir.1988).

## III. DISCUSSION

The sole issue before the Court is whether Jennifer, Joseph, and Jacob DesJarlais, as a matter of law, were "residents" of Edith Shockley's household during the eight weeks that they lived there from mid-December 1987 to February 10, 1988. If the children were residents of the household, then they were "insured persons" under Edith's homeowner's policy, and Allstate is not liable to pay for any injuries they suffered because of Edith's negligence. No Indiana case has dealt with this precise issue in the context of homeowner's insurance, but three recent cases have construed the term "resident of the household" as used in automobile policies.

In *Allstate Ins. Co. v. Neumann*, 435 N.E.2d 591 (Ind.App.1982), the appellee was injured in an accident caused by Rivera, who was driving a car owned by Bates. Neumann sought to recover under Bates's automobile policy, on the theory that Rivera was a resident of Bates's household. Rivera was Bates's girlfriend and spent some time at Bates's house, but spent most of her time at her own home. *Id.* at 592–93.

The court first discussed the meaning of the term "resident," noting that it has "no fixed or precise meaning in the law. It is an amorphous term that ... has as many colors as Joseph's coat." *Neumann*, 435

N.E.2d at 593 (citation omitted). At one extreme, the term might mean "domicile," but at the other end it might mean simple transitory presence. *Id.* (citations omitted). In cases in the middle of the spectrum, "[w]hen used as a term to distinguish from both transient status and domicile, 'resident' may be said to refer to one having a fixed abode but only for the time being. As such, the term involves a subjective element of intent." *Id.* (citations omitted). The court also stated that "at least for some purposes a person may have more than one residence." *Id.*

The court then discussed what rules of construction should apply for defining "resident" in different factual situations. Initially, given the term's possible breadth, a court must look "to both the context in which the term is used and the purpose of [the instrument] in which it is employed." *Id.* (citations omitted). Additionally, as a general principle the term should be construed broadly in "extension" cases (i.e., those dealing with whether coverage should be extended beyond the named insured) and narrowly in "exclusion" cases (those dealing with clauses that remove certain persons or actions from coverage). However, "in choosing a broad or narrow construction ... the choices are limited to the *reasonable* interpretation of the term as used." *Id.* at 593 (emphasis in original). Finally, the court held that in this case, a finding of residency would require "[m]ore than physical presence" plus subjective intent. *Id.* at 594. Finding these elements lacking, the court concluded that Rivera was not a resident of Bates's household.

In *Johnson v. Payne*, 549 N.E.2d 48 (Ind. App.1990), the plaintiff attempted to establish that he was a resident of his former wife's household, so that her automobile insurance coverage would extend to him. In support of his position, Johnson claimed that he intended to reconcile with his wife, but the trial court looked at other evidence and determined that he actually possessed no such intent, and therefore was not a resident. *Id.* at 49–51. Johnson argued on appeal that the trial court erred in considering evidence beyond his assertions in making its determination. The court of appeals, while holding that a declaration of intent must be considered, made clear that such a declaration is only one of many factors the trial court may consider and weigh in reaching a decision. Here, the court found that the weight of all the evidence supported the trial court's findings, and accordingly affirmed the decision. *Id.* at 50–51.

The decision in *Aetna Casualty & Surety Co. v. Crafton*, 551 N.E.2d 893 (Ind.App. 1990) is consistent with *Neumann* and *Johnson.* In that case, a teenaged boy whose parents were divorced was sued by a man he had injured in an automobile accident. The parents had joint custody, but the boy resided continuously with his father (except for occasional overnight visits), and received no support from his mother. The mother's insurer asked for a determination that the boy was not a resident of his mother's household at the time of the accident, and that he therefore was not covered under her automobile policy. *Id.* at 894. The trial court ruled that the boy was a resident of his mother's household; the court of appeals, following *Neumann* and *Johnson*, reversed. *Id.* at 896.[2]

These cases yield a workable two-pronged test for determining whether a person is a household resident for insurance purposes. First, the person must maintain more than a mere physical presence in the household. The person need not be a permanent member of the household, and in fact can be the resident of another household at the same time, but must be more than a transient. Second, the person must possess a subjective intent to stay in the household for more than a transitory period. Whether such intent exists does not depend solely on the person's assertions; a court must also look for objective manifestations (i.e., words and actions) that demonstrate a subjective intent

**2.** The court also held that a joint custody decree by itself does not make a child a resident of both parents' homes. *Id.* at 896.

to stay. On the whole, the person will be a resident if all the facts demonstrate that he or she has maintained a "fixed abode" in the household for some continuous amount of time.

When applied to the undisputed facts in this case, this test demonstrates that Jennifer, Joseph, and Jacob were residents of Edith Shockley's household during their stay with her. The children were not transients, and manifested more than "mere" physical presence in the household. They lived there continuously for eight weeks, and were completely dependant upon Edith for food, clothing, medicine, shelter, and parental care. In addition, it is evident that all the parties intended for the children to stay with Edith for more than a transitory period—in fact, the children were to stay there *indefinitely*. There was neither a predetermined length nor an established cutoff date for the children's stay; the only parameters—both parents finding work, sale of the Indianapolis house, and purchase of a house in California—were conditions that, while "fixed" in a technical sense, could have remained unfulfilled for some time. Even if these parameters had been more definite, this would not automatically mean that the children were *not* residents of Edith's household; [3] in Indiana, a person can be a resident simply by having "a fixed abode" in a household—even if "only for the time being." *Neumann*, 435 N.E.2d at 593. The undisputed facts show that the children met this requirement easily.[4]

In opposing this result, defendants argue in essence that the test spelled out in *Neumann, Johnson,* and *Crafton* does not apply to this case, because those were "extension" cases and this is an "exclusion" case, and the appropriate interpretative standards differ. Specifically, defendants argue that a properly "narrow" construction of "resident" in this case will lead to the conclusion that the DesJarlais children were not residents of Edith's household.

Defendants' argument fails for two reasons. First, even under a narrow construction, the children were residents according to the test spelled out in *Neumann, Johnson,* and *Crafton*. The children lived under Edith's control and were completely dependent on her for all their needs—demonstrating far more than mere physical presence. Moreover, they lived with her for eight uninterrupted weeks,[5] and would have been with her for an indefinitely longer period if not for the discovery of Jennifer's molestation. This substantial amount of time—especially when coupled with the degree of the children's dependence on Edith—demonstrates an intent by everyone concerned that a close, dependent relationship exist and continue well beyond a transitory period. It is difficult to see how children in such a dependent relationship

3. Nor does the fact that the children were residents of Edith's household automatically mean that they were *not* residents of DeWayne's and Karen's household in California. *See Neumann,* 435 N.E.2d at 593.

4. The cases of *Jenks v. Louisiana,* 507 So.2d 877 (La.App.1987), *Londre v. Continental Western Ins. Co.,* 117 Wis.2d 54, 343 N.W.2d 128 (App. 1983), and *A.G. v. Travelers Ins. Co.,* 112 Wis.2d 18, 331 N.W.2d 643 (App.1983), to the extent that they apply, do not dictate a contrary result. Those cases discussed three general factors for determining whether a child has a "dual" residency: (1) whether the child is living under the same roof with the named insured; (2) whether a familial or intimate relationship exists; and (3) whether the duration is likely to be substantial and/or permanent, i.e., whether it is consistent with the relationship to conclude that the parties would consider it when contracting about insurance.

These factors appear to be met in this case. The DesJarlais children lived with Edith, their great aunt, for a substantial and potentially lengthy time. It is logical to conclude that Edith would consider this arrangement when she next contracted for homeowner's insurance—e.g., at renewal—whether or not she actually notified Allstate in December that the children would be living with her.

5. The continuous nature of the children's stay distinguishes this case from *Londre v. Continental Western Ins. Co.,* 117 Wis.2d 54, 343 N.W.2d 128 (App.1983). In that case, a child of divorced parents was determined not to be a resident of his father's household. The child, however, had only irregular contact with his father, and never spent more that two to four weeks at a time with him. *Id.* 343 N.W.2d at 131.

could not be considered household residents.

Second, it is not reasonable, given "the context in which the term is used and the [instrument] in which it is employed," to conclude that the children were not residents of Edith's household. The case of *Allstate Ins. Co. v. Tomaszewski*, 180 Mich.App. 616, 447 N.W.2d 849 (1989) illustrates why this is true. In that case, an eight-year-old boy was bitten by a dog owned by his mother and stepfather, with whom the boy lived. The boy sued his mother and stepfather for damages, and the couple sought liability coverage under their homeowner's policy—an Allstate policy containing the precise terms and definitions at issue here. Allstate argued that the boy was a resident of his mother's and stepfather's household, but the trial court disagreed, holding that the boy was neither a relative nor a legal dependent of his stepfather, who was a named insured. *Id.* 447 N.W.2d at 850.

In reversing, the court of appeals held that while "policy language creating exclusions from coverage [must] be strictly construed against the insurer," an insurance contract also must be "interpreted according to its commonly understood meaning" and "read and interpreted as a whole." *Tomaszewski*, 447 N.W.2d at 850. In addition, because "resident" and "insured person" appeared in the definition section of the policy, the meaning given to these terms "must remain consistent" and the boy "must retain a single status" throughout the insurance contract. *Id.* at 851. Against this backdrop, the court stated that any conclusion that the boy was not an insured person would lead to "absurd and inequitable" results: "The [mother and stepfather] would surely expect coverage under the policy if they were being sued for injuries [the boy] negligently caused to a playmate.... It would be inconsistent, as well as incorrect, to define 'insured person' differently depending on the particular situation." *Id.*

*Tomaszewski* is distinguishable from this case,[6] but its logic is compelling. "Resident" and "insured person" cannot be interpreted one way to bring the DesJarlais children within some policy provisions, then interpreted differently to exclude them from others. Accepting the defendants' argument in this case would open a door to the same type of illogical results contemplated in *Tomaszewski*, and would lead to an unreasonable interpretation of "resident" given its context and use in this case.

Cases relied upon by defendants do not command a different result. In *Cal–Farm Ins. Co. v. Boisseranc*, 151 Cal.App.2d 775, 312 P.2d 401 (1957), the court held that despite a joint custody decree and the child's temporary absence from his father's household to live with his mother, the child was still a resident of his father's household for purposes of insurance. *Id.* 312 P.2d at 406. *Boisseranc* did *not* state, however, that this fact meant that the child was not a resident of his mother's household; in fact, the court recognized a dual residence. *Id.* at 406. As stated above, in Indiana a person may be a resident of more than one household—and by extension, to be covered by more than one homeowner's policy—at a time. *Boisseranc* therefore is not persuasive.

Defendants also cite *Country Mutual Ins. Co. v. Watson*, 1 Ill.App.3d 667, 274 N.E.2d 136 (1971). In that case, a foster child who was injured while performing chores brought suit against his foster parent. The foster parent's insurer argued that the child was a "resident" of the foster parent's household, but the court held that he was not. *Id.* 274 N.E.2d at 137–38. *Watson* is factually similar to this case: the child was placed in the foster home for an indeterminate length of time, and was cared for much like Edith cared for the DesJarlais children. Two key distinctions exist, however, that render *Watson* inapplicable here. First, in *Watson* the child's stay had a pre-determined maximum of five months. *Id.* at 138. In this case, by con-

---

**6.** In *Tomaszewski*, it was undisputed that the boy lived continuously with his mother and stepfather, and that he "was dependent upon them for care and support." *Tomaszewski*, 447 N.W.2d at 851.

trast, there was no fixed maximum duration for the children's stay. Second, the Illinois definition of "resident" is different than the one recognized in *Neumann, Johnson,* and *Crafton:* in that state, the abode must be *permanent,* not merely fixed for a definite time. *Compare Neumann,* 435 N.E.2d at 593 *with Watson,* 274 N.E.2d at 138.

Finally, defendants argue that the phrase "resident of" should be interpreted strictly to mean "domicile," in accordance with *State Election Board v. Bayh,* 521 N.E.2d 1313 (Ind.1988). Defendants' reliance on *Bayh* is misplaced, however. The phrase interpreted in *Bayh* did not come from an insurance contract; it came from the Indiana Constitution, and pertained to residency requirements for gubernatorial candidates. As a result, the concerns and purposes underlying the opinion in that case were considerably different than those present here. In *Bayh,* the court tried to give the phrase a definition consistent with the purpose of the framers—to give gubernatorial candidates a recognized legal status, and to assure their familiarity with state issues, as well as the electorate's familiarity with them. *See id.* at 1316–17. In this case, by contrast, the purpose is simply to establish who is covered under an insurance policy. Because Indiana law prefers interpretations that favor coverage of the insured, *Neumann,* 435 N.E.2d at 593, the definition of "resident" in the insurance context necessarily will be less rigorous than the one enunciated for gubernatorial candidates in *Bayh.*

### IV. CONCLUSION

For the reasons stated above, the Court finds that Jennifer, Joseph, and Jacob DesJarlais were residents of Edith Shockley's household from mid-December 1987 to February 10, 1988, and therefore that they were "insured persons" under her homeowner's policy with Allstate. As a result, Allstate is not liable under the policy either to provide a defense for Edith and/or Norman, or to satisfy any claim or judgment levied against them in any civil action arising from Norman Shockley's molestation of the DesJarlais children from December

1987 to February 10, 1988. Because there is no genuine issue of material fact, Allstate is entitled to judgment as a matter of law, and its motion for summary judgment is GRANTED.

SO ORDERED.