## THE PENINSULA INSURANCE COMPANY
### *v.* KNIGHT, ET AL.

[No. 355, September Term, 1968.]

*Decided July 1, 1969.*

462

The cause was argued before HAMMOND, C. J., and MARBURY, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Richard M. Pollitt,* with whom were *Pollitt, Hughes & Bahen* on the brief, for appellant.

*John W. T. Webb,* with whom were *Thomas L. Lilly* and *Webb, Burnett & Simpson* on the brief, for appellees Nationwide Mutual Insurance Company and Tolson.

*George J. Goldsborough, Jr.,* for appellees Robert L. Knight, Sr. and Frances A. Knight.

Submitted on brief by *Ronald G. Rayne* and *Perdue, Owrutsky & Whitehead* for appellee Ronald Lester Knight.

McWILLIAMS, J., delivered the opinion of the Court.

Our task here is to construe, in the context of facts to be related, an exclusionary clause in a policy of insurance issued by the appellant (Peninsula) to the appellee, Ronald Lester Knight (Ronald). Peninsula denied coverage to Ronald because the claims against him arose out of bodily injury to persons "related [to him] by blood or marriage and * * * [who are] resident[s] of the same household as [Ronald]," namely, his father Robert L. Knight and his mother Frances A. Knight. The words "resident" and "household" are the sand in the gears. In 77 C.J.S. *Resident* at 305 (1952) it is said:

"The word 'resident' is in common usage, and many definitions of it are to be found in the decisions. It is, nevertheless, difficult to give an exact, or even a satisfactory, definition, for the term is flexible, elastic, slippery and somewhat ambiguous."

Judge Prescott (later Chief Judge), writing for the Court, commented on the plasticity of the words "reside" and "residence" in *Gallagher v. Board of Supervisors of Elections,* 219 Md. 192, 202 (1959) :

"It seems to be universally acknowledged that the words 'reside' and 'residence' are legal 'legerdemains' of no small importance. This Court has stated that '[a]ll agree that the word "residence" is, in itself susceptible of different meanings,' *Shaeffer v. Gilbert,* 73 Md. 66, 69, 20 A. 434, and '[t]he term residence is one which is used to signify different things.' *Harrison v. Harrison, supra* [117 Md. 607]. In his noted work, *The Conflict of Laws,* Professor Beale in Volume I, Section 10.3, states:

'Residence, then, is a word which may bear different shades of meaning according to the context. It may mean something more than domicil: a domicil, namely, at which the party actually dwells. On the other hand, it may mean something less than domicil: a dwelling-place adopted for the time being, but without such an intention of permanent abode as to create a domicil there.

'The word "residence" is often used in statutes. When it is used, there is room for difference of interpretation. As used in a statute, the word may mean a domicil; or it may mean a dwelling-place, which lacks the legal requirements of domicil.'

"There is little doubt that the terms 'reside', 'residence' and 'domicile' have been somewhat puzzling to the Courts, textwriters and lexicographers not only in this country but throughout the world. Kennan, *Residence and Domicile,* Ch. 1. Some states have made statutory definitions of one or more of the terms; *but, where there is none, all Courts seem to agree that they must be construed in accordance with the context and the purpose of the constitution, charter, statute or instrument in which they are found.*" (Emphasis added.)

When Peninsula issued its policy to Ronald, on 29 May 1965, he was living with his wife and two children at 918 Hanover Street, Salisbury, Maryland. In March 1966, dissatisfied with his pay check at the Campbell Soup Company in Salisbury, he quit and went to work for Proctor Silex Corporation in Arbutus, a suburb of Baltimore. At first he spent several nights a week with relatives in Severna Park, several nights with his mother and father in Queenstown and the rest of the time with his wife in Salisbury. Queenstown is 65 miles closer to Baltimore than Salisbury. Worn out by the commuting

he asked his father and mother to take them in until he could find a house nearer his work. In April they gave up the house in Salisbury and moved to the parental home. Ronald, his pregnant wife and the children occupied one bedroom, their furniture was stored in the attic and they shared the kitchen and other rooms with his parents. They contributed $20 per week to the cost of food. Ronald tried, without success, to find a house near the Eastern Shore end of the Chesapeake Bay Bridge. Early in May he found a house, not yet finished, near Baltimore. Having been promised June occupancy he deposited $100 of the $118 monthly rental. The baby was due around 18 May.

Saturday, 14 May, was the date of the accident. Ronald's wife and both of his parents were injured and taken to the hospital. His father and his wife were discharged several days later. His mother stayed for nearly two weeks. The baby was born 31 May. The following excerpt from Ronald's testimony explains the change in his plans:

"Q. Did you continue with your plans to move to Baltimore? A. No, sir.

"Q. Why? A. Well, just seemed like since I had gone up to Baltimore the expense itself of running back and forth and finding a home and the baby and just everything just piled up at one time and it just seemed like here I had moved up there to get ahead, because it was a better job and more money and it was day shift, that I was—that I'd be getting ahead, but it just reversed itself, going backwards. All of my expenses of riding back and forth, I was just going deeper in debt. And, when the accident happened that was it. I called Campbell Soup Company the following day and asked if I could come back to work here and he said that I could. And, I said, 'Well, I'll be back as soon as the baby is born.' I didn't want to move my wife until the baby was born.

"Q. And, then, you moved back to Salisbury on what date? A. I come back June the first and I started work the June the second.

"Q. When did your family come back? A. My wife came back a week later."

On 16 May, two days after the accident, Ronald gave a statement to Peninsula's adjuster. The following is an excerpt therefrom:

"I am living with my parents in Queenstown at Box No. 132 and I am working in Baltimore, Md. I work at Proctor Silex Corp. in Arbutus—as a maintenance mechanic. I formerly lived in Salisbury, Md. and worked as a maintenance mechanic at Campbell Soup Co. I have been living with my parents for just under two months."

On 1 June 1967 Ronald's parents filed suit against him and Donald Tolson to recover damages for their injuries. On 20 November 1967 Tolson, to his own use and to the use of Nationwide Mutual Insurance Company,[1] filed a cross-claim against Ronald. Peninsula concedes coverage as to Tolson's cross-claim. Sheldon Seidel, general counsel for Peninsula, who had entered his appearance for Ronald in his parents' suit, testified (in the case at bar) that he was unaware of the fact that Ronald had been living with his parents until, on 1 November 1967, he reviewed the answers to some interrogatories. Peninsula then employed present counsel to file the petition for a declaratory judgment which is the subject of this appeal. Ronald, Tolson, Nationwide and Ronald's parents were named as defendants. The parents, answering the petition, declared that Ronald was "merely a temporary guest in their household" at the time of the accident and not " 'a resident of the same household' as or with" themselves. Nationwide, in its answer, took the position that "the home of the parents was merely an interim abode for

---

1. As used herein "Nationwide" indicates Nationwide Mutual Insurance Company.

[Ronald] Knight during a move of his own family from Salisbury to Baltimore." Tolson, in his answer, adopted the position (using the same language) taken by Nationwide.

The case was tried before Travers, J., sitting without a jury, on 25 September 1968. In an opinion filed 15 November, Judge Travers expressed the "belief that the parties never intended to exclude the policy holder from protection against liability in the suit instituted in this case." He thought "that the most that can be made of his [Ronald's] sojourn at the home in Queenstown was temporary in character and with no idea of, in any sense, of making it permanent." On 2 December he filed the order from which this appeal was taken.

I.

The milieu for our decision here was set by Chief Judge Hammond in *State Farm* [2] *v. Briscoe*, 245 Md. 147, 151 (1967). He said, for the Court:

> "The purpose of the household exclusion is so obviously to protect the insurer against collusive or cozy claims, to exempt him from liability stemming from one whose natural ties and pulls are likely to favor a claimant who lives in the same household, that the courts have unhesitatingly recognized that purpose and excluded from policy coverage claimants who live in the same household as the named insured. *State Farm Mut. Automobile Ins. Co. v. James* (4th Cir.), 80 F. 2d 802, 803-04; *Tomlyanovich v. Tomlyanovich* (Minn.), 58 N.W. 2d 855, 862; *Puller v. Puller* (Pa.), 110 A. 2d 175, 178; *State Farm Mutual Automobile Insurance Co. v. Ward* (Mo.), 340 S.W. 2d 635."

In like vein, Judge Soper, over 30 years ago, in *State*

2. As used herein "State Farm" indicates State Farm Mutual Automobile Insurance Company.

*Farm v. James,* 80 F. 2d 802 (4th Cir. 1936), announced the sentiments of his court:

> "If in accord with the general rule of interpretation, the meaning of the word 'household' in the policy under consideration is determined in the light of the situation in which it was used, there can be no doubt that it was intended to embrace such a person as the plaintiff in this case. Obviously the exception was intended to restrict the company's liability, and the specific purpose was to safeguard the company against the natural and inevitable partiality of the assured to an injured person if he should happen to be a member of the same family circle. This purpose, manifest to any reasonable person, was well described in Cartier v. Casualty Co., supra, 84 N.H. 526, page 528, 153 A. 6, 7 [1931], as follows: 'In considering the purpose of the excepting clause of the policy it is clear enough that it was meant to avoid the insurer's liability to indemnify for injuries to members of the insured's household, whether or not he was its head. The natural tendency of one insured to strengthen or enlarge the evidence of liability to members of his household for accidents insured against increases the hazard of liability under the policy in such cases over that for accidents to others. Without actual dishonesty, the disposition to favor those close to one reflects itself in opinions and judgments, and one insured is more likely to concede by admission or non-resistance blame for hurting a member of his household than for doing harm to others.' " *Id.* at 803-04.

Since there seems to be no decision of this Court precisely in point Peninsula supports its position with decisions of other jurisdictions in which generally similar factual situations prevail. The appellees, on the other

hand, support their contentions with decisions of still other jurisdictions in which contrary results have been reached on generally similar factual situations. The comment of a California appellate court, in *Cal-Farm Ins. Co. v. Boisseranc,* 151 Cal. App. 2d 775, 312 P. 2d 401 (1957), suggests a likely reason for the conflicting decisions:

> "The parties refer to many cases which discuss the terms here involved. [Citing cases.] While the cases do not all appear consistent, it can generally be stated that, insofar as the cases involve insurance policies, they can be roughly divided into cases involving policies excluding from coverage of the policies members of the insured's household, and those extending coverage to such persons. Both attempt to apply the rules of construction above discussed. As a result, in the extension cases the questioned terms are broadly interpreted, while in the exclusion cases the same terms are given a much more restricted interpretation. This is necessary because in both situations the courts favor an interpretation in favor of coverage. * * *.

> "These cases illustrate that the interpretation of the terms involved is not fixed but varies according to the circumstances of the case. They also demonstrate that most courts will interpret the terms so as to extend the coverage if this can be done under any reasonable interpretation of the facts." *Id.* at 405-06.

The decisions relied upon by Peninsula, except for *Jamestown Mut. Ins. Co. v. Nationwide,* 266 N.C. 430, 146 S.E. 2d 410 (1966), deal with exclusionary clauses. In *Dressler v. State Farm,* 376 S.W. 2d 700 (Tenn. 1963), the insurance afforded by the policy did not apply:

> "To bodily injury to the insured or any member of the family of the insured residing in the same household as the insured."

Dr. Stanley Dressler, upon his graduation from medical school in Memphis, where he had been living with his wife and child, accepted an internship in Chattanooga where his parents lived. Until they could find living quarters of their own they moved into the first floor apartment of the converted two story dwelling belonging to Dr. Dressler's parents, who moved into the upstairs apartment. The two Dressler women planned the cooking together and shared the household food and maid expenses. Except for sleeping the downstairs apartment was always open to and used by Mrs. William Dressler as though it were her home. Dr. Dressler "was on the lookout for a suitable apartment," but he had not rented one. The "arrangement was regarded by all of the parties as temporary." After discussing the cases cited by the parties the court said:

> "It is to be seen that no rule applicable alike to all cases can be formulated. Each case must be decided upon its own particular facts. Running through the cases, however, where a family relationship has been held to exist are such things as having the free use of the house, sharing expenses, cooking together and eating together at a common table. And, of course, the relationship of parent and child may be presumptive of a family relationship even though the child be an adult and married with children of his or her own." *Id.* at 702.

In *Third Nat'l Bank v. State Farm*, 334 S.W. 2d 261 (Ky. 1960), Joyce Sewell and her small daughter occupied a bedroom in the home of her parents, the McBrayers, and shared the bathroom with her brother and his wife, Phyllis, who, with their child, occupied another bedroom. Joyce paid her parents $10 per week; the brother and his wife paid $12. Joyce worked and paid Phyllis $10 per week to look after her child. They all shared the use of the living room, kitchen and large bathroom. The question arose, after an accident, whether

Joyce and Phyllis were members of the same family who resided in the same household. There the court said:

"We are impressed by the fact that the clear purpose of the exclusion was to protect the insurer from over-friendly law-suits, which nearly always would exist where plaintiff and insured defendant are bound by ties of kinship and are living together. In the light of this purpose we cannot escape the conclusion that the McBrayers and Joyce were all of the same family and lived in the same household." *Id.* at 263.

In *Rathbun v. Aetna Casualty and Surety Co.*, 144 Conn. 165, 128 A. 2d 327 (1956), Ina, Joseph, Charles and their mother lived together until July 1941 when Ina married and moved out. Four months later her husband joined the armed forces, whereupon Ina stored her furniture and resumed living with her mother and brothers. She went to work and paid her mother for her room and board. She intended to leave her mother's home and return to her husband upon his return. In January 1942 Joseph, while driving Ina's car, injured Rathbun. Although Ina's arrangements with her mother were clearly temporary, the court held that since Ina and Joseph were members of the same household Joseph was not covered under the terms of Ina's policy.

The policy in *Jamestown Mut. Ins. Co. v. Nationwide, supra*, provided coverage to any "relative" of W. F. Hamrick; "relative" was defined to mean "a relative * * * who is a resident of the same household." William Clark Hamrick, the son of the insured, while driving an automobile owned by a dealer, was involved in a collision which resulted in his being sued. The question was whether he was "a resident of the same household" and therefore covered by his father's policy. The court said:

"William Clark Hamrick had no home of his own. He went back to his father's house, carrying with him all his possessions. His intent was

to remain there until living quarters more convenient to his employment could be found and the necessary arrangements made for his occupancy of them. In the meantime, he lived in and used his father's house as he had done when a boy, sleeping there, taking his meals there, having the run of the house, and having his laundry included in the family laundry. For all of this he paid no board. We think it clear that under these circumstances he was 'a resident of the same household' as his father. He is not in the same position as an adult child having a home of his own to which he intends to return and making a mere visit to his parents. Nor is he in the position of a mere roomer or boarder. He was there because he was a member of the family and had no other home." *Id.* at 417.

The court embarked upon an extensive discussion of the word "resident" which it concluded by saying:

"When an insurance company, in drafting its policy of insurance, uses a 'slippery' [77 C.J.S., *supra*] word to mark out and designate those who are insured by the policy, it is not the function of the court to sprinkle sand upon the ice by strict construction of the term. All who may, by any reasonable construction of the word, be included within the coverage afforded by the policy should be given its protection. If, in the application of this principle of construction, the limits of coverage slide across the slippery area and the company falls into a coverage somewhat more extensive than it contemplated, the fault lies in its own selection of the words by which it chose to be bound.

"In the construction of contracts, even more than in the construction of statutes, *words which are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary*

*intent, be given the meaning which they have for laymen in such daily usage, rather than a restrictive meaning which they may have acquired in legal usage. In the construction of contracts the purpose is to find and give effect to the intention of the contracting parties, if possible.* Thus the definition of 'resident' in the standard, nonlegal dictionaries may be a more reliable guide to the construction of an insurance contract than definitions found in law dictionaries. Webster's New International Dictionary, 2d Ed., contains the following definition: [Emphasis added.]

" 'Resident. One who resides in a place; one who dwells in a place for a period of more or less duration. *Resident* usually implies more or less permanence of abode, but is often distinguished from *inhabitant* as not implying as great fixity or permanency of abode.' " *Id.* at 416.

The appellees seem to rely on decisions in which the temporary or transitory aspect of the "residence" has been stressed. The State Farm policy in *Goens v. Arinder,* 248 Miss. 806, 161 So. 2d 509 (1964), cited by appellees, contained an exclusionary clause which denied coverage if the non-owned automobile was "registered in the name of the named insured or a relative"; relative was defined to mean "a relative of the named insured who is a resident of the same household." The Arinders had two daughters, Sylvia, 16, who lived at home and Calva Mae, who was married to William Stogner. At the time of the accident the Stogners were building a home about 200 yards down the road from the Arinders. They moved into the Arinder home so that Stogner would have more time to work on the house and so that Calva Mae, who was pregnant, could be helped by Sylvia and her mother. As the court, in part, recited the facts:

"They moved their bed, washing machine and

refrigerator into the Arinders' house, and other articles of furniture such as stove, dinette, and bed, and clothing into the partially built new home. The Stogners paid all their own expenses, performed their own household duties, and cooked their own meals. Mrs. Stogner spent most of her time during the day at the new house directing workmen. The Stogners were on their own, going and coming as they wished. Sylvia had driven the Stogner car two or three times before the date of the accident, but only with the Stogners' permission, and the Stogner car was never at the disposal of the Arinder family. Either the Arinder automobile or Stogner automobile was left at the Arinder home at all times, but only because of Mrs. Stogner's condition and to be used in the event she needed to get to a doctor. Both families considered the Stogners' stay in the Arinder home temporary. The lower court held that the Stogners constituted a separate family, and just happened to be living in the same house as the Arinders." *Id.* at 511.

Sylvia was driving the Stogner car when young Goens was injured. The effect of the decision that the Stogners were not members of the Arinder household was to extend coverage under the Arinder State Farm policy to Sylvia which, of course, enabled Goens to collect the judgment he had obtained against Sylvia. In holding that the Stogners were not members of the Arinder household the court concluded with this significant statement:

"It is an anomolous situation to think that a husband, wife and child automatically become a member of their parents' household because they, while building a home into which they have already moved part of their furniture, move their bed, refrigerator and washing machine into the parents' house and stay there temporarily. Certainly Mr. Stogner never ceased

to be head of his own family. They were using their own bed, preparing their own meals and paying for their food, clothing and other needs. They were constantly going to the new home to get clothing. Such conduct certainly shows there was no permanency in the arrangement. Webster defines 'residence' as 'a place usually implying more or less permanence of abode, but is often distinguishable from inhabitant as not implying as great flexibility or permanence of abode.' Webster's New International Dictionary (2d ed.)

"We are of the opinion that the Stogners' stay in the Arinder home was no more than a visit or sojourning for the time being until Mrs. Stogner could have her baby and until their house was completed. This was of course temporary, and the proof shows that they did move into the home when these two events had taken place."
*Id.* at 515-16.

One wonders, in light of the above quotations, how the Mississippi court might have decided the case at bar, which, it is clear, presents a factual situation markedly different from that of the Goens-Arinder ménage.

Appellees cite next *State Farm v. Smith,* 206 Va. 280, 142 S.E. 2d 562 (1965), in which the Virginia court (citing *Goens, supra* with approval) affirmed a finding of the trial judge that Elaine Mellow had not become a resident of the household of her sister, Gertrude Frost. Elaine had been living in California with her husband. When he died she was four months pregnant. Bringing only her clothing she came to her sister in Norfolk to stay for the remainder of her pregnancy. She left her furniture, furnishings, appliances and her automobile in California. Two months after her arrival in Norfolk, while driving the Frost automobile, the accident, in which Smith was injured, occurred. A week later she returned to California to live with her mother-in-law. The court held

"* * * that the State Farm policy involved in this case afforded coverage to Elaine R. Mellow [the named insured] at the time of the accident, since she was not a resident of the household of the owner of the automobile, and since the automobile had not been furnished to her for regular use, within the meaning of the policy." *Id.* at 568.

Smith had obtained a judgment against Elaine in the amount of $4,500 which, had the court not held as it did, he might never have collected because the Frost car, oddly enough, was uninsured. We see obvious and significant differences between the facts in this case and the case at bar.

*Giokaris v. Kincaid,* 331 S.W. 2d 633 (Mo. 1960), *Fruchtman v. State Farm,* 274 Minn. 54, 142 N.W. 2d 299 (1966), and a few other similar cases are also cited by the appellees. We shall not undertake to discuss them because, in our judgment, none of them is truly comparable with the case at bar. However, even if the facts and circumstances there presented were more closely akin to the instant case, it is unlikely that we would consider the conclusions therein reached to be persuasive. Indeed, in one of the cases cited by the appellees, *Buddin v. Nationwide,* 250 S.C. 332, 157 S.E. 2d 633 (1967), in which the facts were generally similar to the other cases cited by them, the verdict directed by the trial judge on the only issue presented was reversed. The court held that the evidence was susceptible of only one reasonable inference, i.e., "that Alton Buddin, Jr. *was* a relative resident of the same household as was Horace Buddin, his uncle." (Emphasis added.)

It must indeed be conceded that there is a wide variety of judicial opinion in respect of the applicability of exclusionary clauses hinged upon residence in the household of a relative. 8 Blashfield, *Automobile Law & Prac., Insurance* § 318.4 (1966) ; 12 G. Couch, *Insurance* 2d §§ 45:519-31 (1964) ; 7 J. Appleman, *Insurance Law &*

*Prac.* § 4411 (1942). And there can be little doubt that some courts have striven to produce decisions which will not have the effect of leaving the plaintiff empty-handed. We have not displayed such a disposition however, *Zurich Ins. Co. v. Monarch Ins. Co.*, 247 Md. 3 (1967); *State Farm v. Briscoe, supra; American Cas. Co. v. Harleysville Ins. & Walzl*, 238 Md. 322 (1965); *Selected Risks Ins. Co. v. Miller*, 227 Md. 174 (1961), although until now, as has been said, we seem not to have considered the precise question here presented.

Appellees see in the expression "resident of the same household" an ambiguity which, they insist, requires it to be construed liberally in favor of Ronald and against Peninsula, citing *American Cas. Co. v. Aetna Cas. & Surety Co.*, 251 Md. 677 (1968), and *Aviation Employees Ins. Co. v. Barclay*, 237 Md. 318 (1965). The words themselves are clear, simple and in general use. Put together they express a simple, homely, familiar concept. *See U. S. Naval Academy Alumni Ass'n v. American Publishing Co.*, 195 Md. 150 (1950). Before we can say they are ambiguous we must examine them "in accordance with the context and the purpose of the * * * instrument in which they are found." *Gallagher v. Board, supra.* The purpose of the language has already been stated, *State Farm v. Briscoe, supra* and it needs no further elaboration. The context urged by the appellees requires the addition of the word "permanent" and, of course, their position is understandable, but we see no reason why the meaning of "resident" should be so restricted. In any case the addition of the word "permanent" would in itself create a problem. How long is permanent? How much less than the remainder of a lifetime must one reside somewhere to acquire the status of a "permanent" resident? A "resident" of a household may have a status ranging from temporary to permanent but, as we see it, he is nonetheless a resident. In most of the cases discussed herein the status "resident of the household" was held to exist, although the arrangement was conceded to be temporary. Even in those cases where the status "resident of

the household" has been denied and where the temporary nature of the arrangement has been noticed by the courts the decisions were based not alone on that reason but also on additional reasons. In the case before us it is undisputed that Ronald abandoned his residence at 918 Hanover Street in Salisbury. He moved out with all that he owned, lock, stock and barrel. When he came back to Salisbury it was to another house, 511 Camden Avenue. Unlike the situation in *Goens v. Arinder, supra,* all of his furniture and appliances were stored in the attic of the house in Queenstown. They occupied one bedroom, not an apartment, as in *Dressler, supra.* They "used the same kitchen and living room and everything" as Ronald's parents and "brother and sisters did." They did not buy and cook their own food as did the Stogners (*Goens v. Arinder, supra*) but they contributed $20 per week to help with the grocery bills. There seems to be no doubt that Ronald's father was the head of the household. There were four other children (a brother and three sisters) also living there and there is nothing to suggest that any of them did not recognize him as the head of the household. Appellees insist, in effect, that after Ronald moved from 918 Hanover Street he was not a "resident" of any place until early in May when he made a deposit on the unfinished house near Baltimore, and that, ipso facto, he thereupon became a resident of that half-finished house, even though he had visited it but once. His wife seems not to have seen it; they moved nothing into it; they never spent a night there; they did not thereafter take possession of it. Although we recognize the existence of the "floating zone" in zoning matters we find the concept of a "floating resident" unpalatable. Ronald had to be a resident of some place between his departure from 918 Hanover Street and his return to 511 Camden Avenue. *Cf. Langhammer v. Munter,* 80 Md. 518, 525-26 (1895). We hold that he was a resident of his father's house in Queenstown.

We are fully persuaded that Ronald and his family became members of his father's "household." It is true that

many of the courts have decried the "households" described in the cases before them but we have not found any that has denied that status to any group of persons living together in circumstances similar to those of this case.

## II.

It will be recalled that in Ronald's statement of 16 May 1966, two days after the accident, reference is made to the fact that he was then living with his parents at Queenstown. Appellees press the argument that Peninsula is thereby estopped to deny him coverage. Also, they say, Peninsula waived its right to interpose the exclusionary clause because after undertaking to defend Ronald it later instructed its attorney to withdraw from the suit filed by Ronald's parents. We have examined the record with considerable care and we are satisfied that it supports neither of these contentions. *Zurich Ins. Co. v. Monarch Ins. Co., supra.*

> *Judgment reversed.*
> *Case remanded for the entry of a judgment conformable with the views expressed in this opinion.*
> *Costs to be paid by the appellees.*