Arden B. ENGERBRETSEN, Eleanor Engerbretsen, and United Services Automobile Association, Plaintiffs,

v.

Arden A. ENGERBRETSEN, Deborah Engerbretsen, Andrew L. Engerbretsen, a minor, and Arden A. Engerbretsen, Jr., a minor, Defendants.

C.A. No. 92C–07–093.

Superior Court of Delaware,
New Castle County.

Submitted: June 19, 1995.
Decided: July 5, 1995.
Motion for Reargument Decided:
Aug. 10, 1995.

Kenneth M. Doss, Wilmington, for plaintiffs.

Lawrence S. Drexler, William D. Sullivan, Lisa B. Borin, Wilmington, for defendants.

## OPINION

GOLDSTEIN, Judge.

This is the Court's decision on cross motions for summary judgment filed by Plaintiffs, Arden B. Engergretsen, Eleanor Engergretsen, and United Services Automobile Association (USAA), and Defendants, Arden A. Engergretsen, Deborah Engerbretsen and two minors, Andres L. Engergretsen and Arden A. Engerbretsen, Jr. For the reasons set forth below, USAA's Motion for Summary Judgment is **GRANTED;** Defendants' Motion for Summary Judgment is **DENIED.**

### STATEMENT OF FACTS

USAA filed this declaratory action in July 1992 to determine coverage under a homeowners insurance policy issued by USAA for

an accident that occurred on November 2, 1990. The facts, taken from the parties' papers, are as follows. Defendant Andrew L. Engerbretsen, then two years old, was injured when he was run over by a lawn tractor-mower being driven by his father, Arden A. Engergretsen. The accident occurred on the premises of nominal plaintiffs Arden B. and Eleanor Engergretsen, located in Centerville, Delaware (hereinafter referred to as "the premises"). Arden B. and Eleanor Engerbretsen (hereinafter referred to as "the grandparents") are the parents of Arden A. Engergbretsen (hereinafter referred to as "the father") and the grandparents of Andrew and his brother, Arden, Jr. During all relevant time periods, the premises were insured by USAA under a primary homeowners insurance policy and personal umbrella excess policy. Defendants are not named insureds under either policy.

At the time of the accident, Defendants were staying with the grandparents at the premises while the father looked for employment. Defendants previously lived in Holland, Pennsylvania, but when the father lost his job, Defendants sold their Pennsylvania house and moved onto the premises in March 1990. Most of Defendants' belongings, including their furniture, were stored in the garage on the premises. Defendants kept only clothing, day-to-day living essentials, and toys unpacked for use at the premises. Defendants also kept their car at the premises. They were given the entire downstairs of the premises to live in, and no definite time limit was placed on their stay other than until the father found a job. Defendants and the grandparents shared the general living areas of the house and ate their meals together. However, their finances were not integrated.

A brief period of absence interrupted Defendants' stay at the premises. During the last two weeks of July 1990, Andrew's parents vacationed in Norway while Andrew and Arden, Jr. stayed with their maternal grandparents in Utah. Also, during the month of August 1990, the entire Engerbretsen family

visited Utah.[1] Defendants returned to the premises around the end of August 1990.

Arden A. and Deborah Engerbretsen had a separate automobile insurance policy with USAA. On March 3, 1990, Defendants notified USAA that their new mailing address was that of the premises. However, the automobile policy listed the principal location of Defendants' vehicle as the Holland, Pennsylvania address and the policy followed Pennsylvania law. Also, on the date of the accident, Defendants' automobile policy listed their former Pennsylvania home as their principal residence.

The father's employment efforts led him to interviews in New York, Philadelphia, Florida, Houston, Phoenix, and Denver. The interview in New York took place a week before the accident and was the only one that resulted in a serious job prospect. The father was to learn whether he would be offered a position on November 2, 1990, the day of the accident. Regardless of whether the father was offered a job, Defendants decided to leave the premises by November 5, 1990. If the father got the job, Defendants planned to move to New York. If he did not get the job, Defendants planned to move to Arizona to establish residency before the father applied to a business school in Phoenix.

In the week before the accident, the father reserved a moving truck to move Defendants' belongings either to New York or Arizona. On November 1, 1990, the father contacted USAA about a renter's policy to protect Defendants' personal property during the move and at their new address. On November 2, 1990, about three hours before Andrew's accident the father purchased a renter's policy, giving the address of the premises as the family's residence.

The accident giving rise to this dispute occurred while the father used a tractor-mower owned by the grandparents to mow the lawn behind the grandparents' house. The father backed up the riding lawn mower without looking behind him as Andrew approached the tractor-mower from behind.

---

1. The family also spent a total of two weeks in sporadic visits to the paternal grandparents' beach house in Bethany Beach, Delaware.

The father did not see Andrew and accidentally knocked the child down and ran over him with the tractor-mower. Immediately before the accident, Andrew had been playing in the grandparents' house, watched by his mother and grandmother. They allowed Andrew to leave the house to join his father and brother outside. However, Andrew's mother and grandmother did not know that the father was using the tractor-mower.

Because of Andrew's injuries, Defendants did not move as planned in early November 1990. Defendants continued to stay at the premises because Andrew required medical treatment, surgery, and therapy. It was not until February 1991 that Andrew's injuries were sufficiently healed so that Defendants could move out of the premises.

On December 7, 1990, the grandparents submitted the first written notice of loss to USAA regarding Andrew's injury. On January 14, 1991, USAA extended coverage to Defendants under the "Medical Payments to Others" ("MPO")[2] portion of the grandparent's homeowners policy. On June 18, 1991, after completing an investigation of the accident, USAA denied coverage under the liability portion of the homeowners policy. The parties, having completed discovery, have filed cross motions for summary judgment pursuant to Super.Ct.Civ.R. 56.

### ISSUES PRESENTED

In its Motion for Summary Judgment, USAA raises five issues. First, USAA argues that Andrew's injuries are not covered under the "Coverage E–Personal Liability" ("Coverage E") provision of the grandparents' homeowners policy due to Andrew's status as a "resident relative" or a person under the age of 21 in the care of a "resident relative" or the named insured, thus bringing him within a policy exclusion. USAA next claims that the exclusion from Coverage E is "supported by Delaware public policy and existing law." Third, USAA asserts that its payment under the MPO provision of the policy does not constitute waiver of the exclusionary provision of Coverage E. Fourth, USAA claims that, because there is no coverage under the primary homeowners policy, the grandparents' umbrella policy is not triggered. Last, USAA claims that, even assuming that Andrew was not a "resident of the grandparents' household" at the time of the accident, there still would be no coverage owed because Andrew was not an "insured" under the homeowners policy.

Defendants respond in their cross-Motion for Summary Judgment that Andrew is "covered by the homeowners policy unless USAA proves that a policy exclusion forfeits that coverage." Defendants first contend that Andrew's injuries are covered under the policy. Defendants next assert that "USAA cannot, as a matter of law, meet its burden of proving an exclusion to defeat coverage."

### STANDARD OF REVIEW

■ The Court will grant a motion for summary judgment pursuant to Rule 56 when, in viewing the record in the light most favorable to the non-moving party, the movant has shown that no material issues of fact exist and so that the movant is entitled to judgment as a matter of law. Super.Ct.Civ.R. 56(c); *Burkhart v. Davies*, Del. Supr., 602 A.2d 56, 59 (1991). In this case, the facts are largely undisputed by the parties. Indeed, in cases involving cross motions for summary judgment, such as presented here, the parties implicitly concede the absence of material factual disputes and acknowledge the sufficiency of the record to support their respective motions. *Browning–Ferris, Inc. v. Rockford Enter., Inc.*, Del.Super., 642 A.2d 820 (1993); *Merrill v. Crothall–American, Inc.*, Del.Supr., 606 A.2d 96, 100 (1992), citing *Fiduciary Trust Co. v. Fiduciary Trust C.*, Del.Supr., 445 A.2d 927 (1982). However, on a summary judgment

---

2. That section provides as follows:
   **COVERAGE F—Medical Payments to Others**
   We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing bodily injury ... This coverage does not apply to you or regular residents of your household except residence employees. As to others, this coverage applies only:
   1. To a person on the insured location with the permission of an insured....
   *Homeowners Policy*, Section II, Coverage F, p. 13.

motion, the Court is empowered to make factual determinations where the facts of the case are not in dispute and the inferences to be drawn therefrom point to a single conclusion. *Faircloth v. Rash,* Del.Supr., 317 A.2d 871 (1974). In this case, the controversy involves the proper interpretation of language contained in an insurance policy. As such, the issue to be resolved by the Court is one of law. *Hudson v. State Farm Mutual Ins. Co.,* Del.Supr., 569 A.2d 1168 (1990).

Interpreting contract language, while analytically a question of fact, is treated as a question of law by the Court. *Klair v. Reese,* Del.Supr., 531 A.2d 219, 222 (1987). In construing the language of an integrated agreement, the meaning of the written terms is defined in light of the surrounding circumstances. *Id.* at 223. If the language of an insurance contract is clear and unambiguous, the Court will not destroy or twist the words under the guise of construing them. *Hallowell v. State Farm Mut. Auto. Ins. Co.,* Del.Supr., 443 A.2d 925, 926 (1982). The parties will be bound by the plain meaning of the policy language because creating ambiguity where none exists could, in effect, create a new contract with rights, liabilities, and duties to which the parties have not assented. *Id.*

An ambiguity exists when the language of the contract permits two or more reasonable interpretations. *Id.* When the language of an insurance contract is ambiguous and doubt exists as to coverage, the contract will be interpreted against the insurer who drafted the policy and in favor of the insured. *State Farm Fire and Cas. Co. v. Hackendorn,* Del.Super., 605 A.2d 3 (1991). Stated another way, the policy will be construed broadly to extend coverage and narrowly to exclude coverage. In addition, the insurance contract will be read in accordance with the reasonable expectations of the insured so far as the contract language will permit. *Hallowell,* 443 A.2d at 926–927.

## DISCUSSION

The primary dispute in this action is whether exclusions in the grandparents' homeowners insurance policy apply to defeat coverage of Andrew's accident. Specifically, the inquiry hinges on whether Defendants were residents of the grandparents' household at the time of the accident.

Section II of the grandparents' homeowners policy contains provisions that discuss liability coverage, exclusions to coverage, and exceptions thereto. Coverage E, found in Section II, provides:

**Coverage E—Personal Liability**

If a claim is made or a suit brought against an insured for damages because of bodily injury or property damage caused by an occurrence [3] to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the insured is legally liable; . . . .

There are various exclusions under Coverage E, one of which is the subject of the dispute in this action. The "household" exclusion provides:

2. **Coverage E—Personal Liability** does not apply to:

 f. bodily injury to you or an insured within the meaning of part a. or b. of "insured" as defined.

The policy defines "you" and "your" as:

[t]he "named insured" shown in the declaration and the spouse if a resident of the same household.

In this case, the terms, "you" and "your" refer to the grandparents. The term "insured" is defined as:

[y]ou and residents of your household who are:

 a. your relatives; or

 b. other persons under the age of 21 and in the care of any person named above.

It is undisputed that Defendants are relatives of the grandparents. It is also undisputed that, at the time of the accident, An-

---

**3.** The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in bodily injury or property damage."

drew was a person under the age of twenty-one and in the care of the grandparents and/or his parents. The issue is whether Andrew is an "insured" under the household exclusionary provision. That question, in turn, depends on whether Defendants were residents of the grandparents' household under the policy at the time of the accident.[4]

The term "residents of [the policyholder's] household" is not defined in the homeowners policy. The meaning of "residents of the [policyholder's] household," in the context of a homeowners insurance policy, is a matter of first impression for this Court. Courts in other jurisdictions have interpreted the same or similar language in such a context but the issue remains unsettled. The main disagreement among the courts relates to whether, in determining the meaning of the term, the subjective *intentions of the occupier* and the policyholder as to the transient or permanent nature of the stay should be considered. In other words, the dispute involves whether the temporal element of the stay at the policyholder's premises is relevant to the analysis.

USAA relies on a line of cases holding that the relevant policy language is not ambiguous. *Peninsula Ins. Co. v. Knight,* 254 Md. 461, 255 A.2d 55, 63 (1969); *Willis v. Allstate Ins. Co.,* 88 Md.App. 21, 591 A.2d 896, 901 (1991) ("[t]he words themselves are clear, simple and in general use. Put together they express a simple, homely, familiar concept."). Because the courts found no ambiguity in the policy language, the courts declined to construe the provisions against the insurance companies and in favor of coverage.

In the cases relied upon by USAA, the courts considered certain factors in determining whether a person is included as a resident of a policyholder's household. For instance, *Willis* and *Knight* determined that factors such as the abandonment of a prior residence with *no intent to return* there, close familial ties, the dwelling of the family under one roof with shared enjoyment of the living facilities, sharing of meals, and support of the occupier by the policyholder were all relevant considerations. *Willis,* 591 A.2d at 900; *Knight,* 255 A.2d at 63–64.

*Willis,* relying heavily on *Knight,* refused to consider the subjective intention of the occupier and the policyholder in the analysis. *Id.,* 591 A.2d at 901. *Knight* held that intent to become a member of the policyholder's household or the policyholder's consideration of an individual as a member of his household are irrelevant in interpreting the term "resident of the household." 255 A.2d at 63. *Knight* reasoned that "[a] 'resident' of a household may have a status ranging from temporary to permanent but, as we see it, he is nonetheless a resident." *Id. But cf. Farmers Ins. Co. of Arizona v. Oliver,* App., 154 Ariz. 174, 741 P.2d 307, 310–311 (1987) (" 'resident of [the policyholder's] household,' on its face and as applied, is not ambiguous, and thus, must be interpreted according to its ordinary meaning;" the court then considered the subjective intent of the parties).

Defendants, on the other hand, assert that the phrase, "residents of [the policyholder's] household," is ambiguous, and thus, Defendants urge the Court to construe the language to extend coverage in their favor and to read the exclusion narrowly. Defendants cite cases which, unlike *Willis* and *Knight,* consider the subjective intent of the occupier and the policyholder as factors in defining the phrase at issue. *See Amco Ins. Co. v. Norton,* 243 Neb. 444, 500 N.W.2d 542 (1993); *Allstate Ins. Co. v. Shockley,* S.D.Ind., 793 F.Supp. 852 (1991), *aff'd,* 980 F.2d 733 (7th Cir.1992); *Lang v. Foremost Inc. Co.,* 98 Or.App. 161, 778 P.2d 510 (1989); *Oliver, supra, State Farm v. Lawson,* Minn.App., 406 N.W.2d 20 (1987).

Defendants also rely on Delaware case law that has interpreted the same or similar policy language in context of automobile insurance policies. In construing the meaning of the policy language, the Court considered the parties' subjective intent. *See Ellis v. Travelers Ins. Co.,* Del.Super., C.A. No. 93C–01–155, Babiarz, J. (Aug. 24, 1994) (Construing "residents of your household"); *Jones v. Na-*

---

4. Generally, where the alleged resident is a minor, the intent that is relevant is that of the person or entity with legal custody. *Farmers Inc.*

*Co. of Arizona v. Oliver,* App., 154 Ariz. 174, 741 P.2d 307, 311 (1987) (citations omitted).

*tionwide*, Del.Super., C.A. No. 90C–05–217, 1993 WL 189505, Del Pesco, J. (May 10, 1993) (construing "living in your household").[5] In these automobile coverage cases, this Court found that more than mere physical presence at the insured premises was required to be considered a resident of the premises. Both *Ellis* and *Jones* held that the "subjective element of intent" of the parties must be considered in ascertaining the meaning of the relevant policy language. *Ellis, supra* at 4; *Jones, supra* at 5. Neither *Ellis* nor *Jones* determined whether the term "residents of your household" was ambiguous.

Upon review of case law, the Court determines that the term "resident of the household," as used in a homeowners insurance policy, is unambiguous on its face. *Oliver*, 741 P.2d at 310; *State Farm Fire and Cas. Co. v. Lawson*, Minn.App., 406 N.W.2d 20, 22 (1987); *Pamperin v. Milwaukee Mut. Ins. Co*, 55 Wis.2d 27, 197 N.W.2d 783, 789 (1972). Thus, the term should be given a plain and common meaning. In addition, as further discussed below, the Court does not believe that it is impossible to determine the meaning of the relevant policy language as applied to the undisputed facts of this case.

■ In ascertaining the meaning of the phrase "resident of [the policyholder's] household" in the context of a homeowners insurance policy, the Court adopts the definition and approach espoused in *Norton, supra* and Delaware automobile coverage cases. *Norton* succinctly reviewed various jurisdictions. Ultimately, *Norton* held that, where the term "residents of the household" is undefined in a homeowners policy, the clause means "one who dwells or has an abode under the same roof as the named insured for a duration of sufficient length so that the occupiers can be said to compose a family." 500 N.W.2d at 546–547; *Shockley*, 793 F.Supp. at 856 (occupier deemed to be a resident if all the facts establish that he maintained a "fixed abode" in the policyholder's household for some continuous amount of time). In determining the meaning of the relevant policy language, *Norton* considered the following, cumulative though not exhaustive, factors set forth by other courts:

(1) the intent of the occupier and the policyholder;

(2) the formality of the relationship between the occupier and the policyholder;

(3) the permanence or transient nature of the occupier's residence therein;

(4) the absence or existence of another place of lodging for the occupier; and

(5) the age and self-sufficiency of the occupier.

500 N.W.2d at 547.

The Court noted that "no one factor is controlling but that all of the elements must combine to a greater or lesser degree in order to establish the relationship." *Id.* at 546; *Shockley*, 793 F.Supp. at 856 (declaration of intent only one of many factors the trial court may consider and weigh in reaching a decision); *Lawson*, 406 N.W.2d at 22 (the factors "merge to create either a portrait of a relationship akin to household membership or one more transient in character"); *Pamperin v. Milwaukee Mut. Ins. Co.*, 55 Wis.2d 27, 197 N.W.2d 783, 788 (1972) ("the subjective or declared intent of the [occupier], while a fact to be considered, is not controlling, but the intended duration oftentimes must be determined only after a thorough examination of all the relevant facts and circumstances surrounding the relationship").

■ *Norton* defined "household", for purposes of insurance policies, as "those who dwell under the same roof and compose a family." 500 N.W.2d at 545 (citations omitted); *Lawson*, 406 N.W.2d at 22 (equating "household" to be synonymous with "family"; that is, "those who dwell together as a family under the same roof"). However, in ascertaining the term "resident of your household" by considering, *inter alia*, intent and the length of the stay, the occupier need not be a

---

5. In *Jones*, this Court concluded that the term "living in your household" was synonymous with the phrase "residents of your household" and other similar wording (such as "members of your household"). *Jones, supra* at 5. However, in

*Fisher v. Novak*, Del.Super., C.A. No. 88C–MY–21, 1990 WL 82159, Lee, J. (June 11, 1990), the Court found that the language "lives with" was of ordinary significance, unlike the concept of "residence or domicile".

permanent member of the policyholder's household. *Shockley,* 793 F.Supp. at 856. Rather, the occupier must be more than a mere transient or intend to stay for more than a temporary period. *Id.*

■ In the Court's view, the analysis should be the same whether considering the issue of membership in a household in the context of an exclusionary or inclusionary provision of the insurance agreement, *Pamperin,* 197 N.W.2d at 789, and regardless of whether the term appears in a homeowners or in an automobile policy. Although there are differences between the two contexts, the Court finds the Delaware automobile coverage cases to be instructive in interpreting the term "residents of the household" as used in a homeowners policy. Indeed, in *construing the phrase in the context of auto-mobile coverage, this Court, in Ellis considered case law in both contexts. Ellis, supra* at 7 (considering *Lang, supra*). Additionally, the Court reiterates that the element of intent is merely one of several factors to be considered in the inquiry.

■ In this case, Defendants assert that they are not residents of the grandparents' household because they did not intend to become a part of the grandparents' household, nor did the grandparents intend for Defendants to become a part of the grandparents' household. Defendants contend that their stay at the premises was intended to be temporary, that is, only until the father found employment.[6] Defendants' arguments clearly focus on the transitory nature of the stay at the premises as a temporary living arrangement and the lack of intent of Defendants to become a part of the grandparents' household. The Court, however, is not persuaded that Defendants were not residents of the grandparents' household for purposes of the policy at the time of the accident. The Court concludes that other circumstances

present in this case outweigh the stated intention of the parties and that the cases relied upon by Defendants can be distinguished.

First, Defendants' reliance on *Farmers Ins. Co. of Arizona v. Oliver,* App., 154 Ariz. 174, 741 P.2d 307 (1987), is misplaced. In *Oliver,* a child went to live with his grandparents for seven months because his father, as the result of an accident, was temporarily unable to take care of him. The father did not intend to take the child back until he had recovered, resumed employment, and saved sufficient funds to obtain a larger apartment that would accommodate them both. When the child drowned in his grandparents' pool, the father had resumed his employment and rented a new apartment but was not living there yet. *Oliver* held that the child was not a resident of the grandparents' household. *Id.,* 741 P.2d at 311. The court found persuasive that both the father and the grandparents viewed the arrangement as temporary due to the father's temporary adverse circumstances, not because the parties felt that the grandparents' home offered a better environment for the child. *Id.* at 312.

In contrast, Andrew's father was not away for the nine and a half months that Defendants lived at the premises. Rather, the father stayed with his family at the premises. Comparing the two situations, the transient nature of the occupier's stay with the policyholder in *Oliver* is more evident than the case at bar.

The facts in *Norton, supra,* also may be distinguished from the case at bar. *Norton* held that a niece staying with her aunt and uncle for the summer was not a resident of the household because the record contained no evidence of "any degree of permanence in the living arrangement". 500 N.W.2d at 547. The niece took only those belongings required for her stay and returned to her

---

6. Q: Living with you [Grandfather] regularly for some months?
A: Yeah. [Andrew's parents] were out of work and looking for a position, and had **come [to the premises] on a temporary basis as they were seeking employment** and were staying there while they were looking.
Transcript of Arden B. Engerbretsen, p. 9 (emphasis added).

Q. Would you [Andrew's mother] agree with your husband that you were basically **using the [premises] as a temporary residence until he either found a job or chose to go to school at the Thunderbird School—**
A. Yes.
Transcript of Deborah Engerbretsen, p. 4 (emphasis added).

parents' house on occasional weekends and at the end of the summer after her injury. While staying with her aunt and uncle, the niece continued to receive mail and telephone messages at her parents' house.

In contrast, the circumstances in the present case reveal a more permanent arrangement. Most significantly, unlike in *Norton,* Defendants did not have any other residence to which they could return while living at the premises or where mail and telephone messages could be received. Defendants notified USAA of their change of address with respect to their automobile policy and gave the premises as their new mailing address. Presumably, Defendants received all mail at the premises and the father used the premises' address and phone number in filling out his job applications. Defendants eventually did move out of the premises in February 1991. However, as of November 2, 1990, the date of the accident, the Court finds that Defendants were residents of the grandparents' household.

Defendants point to *Lang v. Foremost Ins. Co.,* 98 Or.App. 161, 778 P.2d 510 (1989), in which a daughter's family stayed at her mother's home for an indefinite period, during which time the son-in-law attempted to find employment and dealt with temporary financial difficulties. The daughter's family kept their belongings in the garage except for some clothing. They did not pay any rent or living expenses. *Lang* held that the daughter's family did not become residents of her mother's household. 778 P.2d at 512.

However, as stated earlier, there are other factors to consider which may overcome the stated intent of a transitory living arrangement. In Defendants' situation, there are other strong factors that outweigh the declared intention of the parties. The circumstances in this case go beyond a mere temporary living arrangement while the father looked for employment.

One factor courts have considered to be significant is whether there is a definite time limitation on the stay. As stated earlier, the occupier need not be a permanent resident but more than mere transience is required in order to find residence. In cases where there was a definite limit to the length of the stay at the insured location, other courts have tended to find that the stay was of a temporary nature and that occupiers were not residents of the household. *Lawson,* 406 N.W.2d at 22–23 (mother and son who stayed at her father's house while she looked for a new apartment were not residents of the father's household where, *inter alia,* the stay was strictly limited to a period of about a month while the father was away); *Allstate Ins. Co. v. Chia–I Lung,* 131 Misc.2d 586, 501 N.Y.S.2d 260, 265 (1986) (father who had his own room in son's house and stayed continuously for up to six months was not a resident of his son's household because father had a Taiwanese passport, a six-month visa to stay in the U.S., no bank accounts in the U.S., and had a house in Taiwan, all of which indicated that father would return to Taiwan).

However, in Defendants' case, there was no such definite limit imposed on the length of Defendants' stay at the premises. While it was understood that Defendants would leave once the father found a job, there was no specific time constraint imposed on Defendant's stay, such as in *Lawson* and *Chia–I Lung.* To the contrary, as stated above, Defendants were welcome to stay for as long as necessary.[7]

Defendants attempt to downplay the duration of their stay at the premises by contending that it consisted of two brief, distinct periods, divided by a one-month absence in August 1990 when Defendants were in Utah. Defendants lived at the premises from March to Mid–July 1990. During the last two weeks of July, Andrew's parents, along with other adult members of the Engerbretsen family, vacationed in Norway. After their one month visit to Utah, Defendants lived at the premises from the end of August 1990

---

7.  Q: [Defendants] were welcome to stay with you [Grandmother]?
    A:  They were exceptionally welcome.
    Q:  As long as it took until [Andrew's father] could find another job? ·

A: Well, he was our son, and he is always welcome if they had a need.
Transcript of Joy Eleanor Engerbretsen, p. 4–5.

until February 1991. The Court is not persuaded by Defendants' argument.

During the period of absence from the premises, all of Defendants' belongings continued to be stored in the garage of the premises. It is revealing that Defendants considered the premises to be their "home base" or the "major place" for storing their belongings.[8] It also is significant that Defendants returned to the premises after their trip to Utah. The visit to Utah was, unlike Defendants' stay at the premises, brief and temporary. The Court is satisfied that Defendants visited Utah with the intent to return to the premises.

The duration of Defendants' stay at the premises cannot be treated lightly. Defendants stayed continuously for about four and a half months at the premises before the Utah and Norway visits and for about five months continuously after they returned. With the exception of these brief trips, Defendants spent a total of approximately nine and a half months at the premises between March 1990 and February 1991.[9]

Defendants also argue that they were not residents of the grandparents' household because their place of residence was in Holland, Pennsylvania. Defendants cite their USAA automobile insurance policy, which, at the time of the accident, listed Defendants' previous Pennsylvania address as their residence and as the location of the automobile. The Court finds this argument to be disingenuous.

Despite the fact that Defendants listed the Pennsylvania address as their place of residence on the automobile policy, Defendants sold their Pennsylvania residence prior to moving onto the premises in March 1990. It is clear that Defendants abandoned their previous residence in Pennsylvania prior to moving onto the premises and that the Pennsylvania home was not an alternative place of lodging. Indeed, after moving onto the premises, Defendants considered the premises as their primary place of residence.[10]

It is also evident from the record that the relationship between grandparents and Defendants was close and informal. In addition to the close familial ties, there is no evidence of enmity in the relationship, such as that found between father and daughter in *Lawson, supra.* In *Lawson,* despite the fact that the daughter/occupier stayed at her father/policyholder's house for about a month, had mail forwarded to the father's address, and used the father's address as the daughter's residence on her son's school and welfare records, the Court found that the daughter was not a resident of the father's household. 406 N.W.2d at 23. The significant circumstance in *Lawson,* not present here, is that father and daughter did not get along; in fact, there was animosity between them. *Id.* However, the father allowed his daughter and grandson to live in his house because he was away. The daughter and grandson were to be out by the time the father returned. *Id.* at 22. Indeed, mindful of their strained relationship, the daughter took care to keep the house very organized and clean. *Id.* at 23. Given the strained relationship between father and daughter, there was no doubt that the daughter's stay

---

8. Transcript of Deborah Engerbretsen, p. 4, 5.

9. It appears from the record that Defendants intended, and prepared, to leave the premises by November 5, 1990, either for New York or Arizona. They were prevented from leaving by Andrew's injury and subsequent medical treatment and therapy. However, even if the Court considered early November as the termination point of Defendant's stay at the premises, rather than February 1991, Defendants still would have spent a total of approximately seven and a half months at the premises. Coupled with the myriad of other factors discussed herein, the Court finds that on the day of the accident on November 2, 1990, Defendants were residents of the grandparents' household.

10. Q: And you [andrew's father] pretty much stayed consistently at [the premises] through July of 1990?
A: For the most part, yes.
Q: When you say for the most part, did you have any other locations where you stayed during that time?
A: Well, we were, spent time down at the beach house in Bethany.
Q: Is that your parent's beach house?
A: Yes.
Q: But you had **no other primary place where you stayed or kept your things, is that correct?**
A: **That's correct.**
Transcript of Arden A. Engerbretsen, P. 16 (emphasis added).

would be strictly limited to the one month period and that the parties had no intention of living together.

To the contrary, the record here reveals that Defendants and the grandparents enjoyed an intimate and amicable relationship, illustrated by the parties' living together under one roof for nine and a half months. Indeed, the grandparents welcomed Defendants into their home on previous occasions while the father looked for work. Defendants occupied the first floor of the grandparents' house while the parties shared general living space and meals. Although Defendants unpacked only daily necessities for use at the premises, all of Defendants' personal belongings were stored in the garage of the premises, including the family car. Moreover, Defendants (excluding Andrew and Arden, Jr.) and the grandparents, along with other adult members of the Engerbretsen family, went on a two-week vacation to Norway together.

In the Court's view, the record establishes a portrait of a close, extended family, living as members of a single household under one roof for a substantial period of time, sharing meals and vacationing together. The Court is convinced that the circumstances in this case, including the fact that Defendants considered the premises to be the primary place of residence during their stay, had no other place of residence, enjoyed an intimate and informal relationship with the grandparents, and spent a substantial length of time at the premises, outweigh the declared subjective intention of Defendants of a temporary living arrangement. Thus, the Court concludes that Defendants were residents of the grandparents' household under the policy on the date of Andrew's accident.

The remaining issues presented in USAA's motion need not be addressed by the Court. The question of whether the umbrella policy would be triggered in this case depends on whether coverage is extended under the primary homeowners policy. As noted above, USAA issued both policies to the grandparents covering the premises. Both policies were in effect on the date of Andrew's accident. The umbrella policy provides excess coverage for occurrences covered by the homeowners policy.[11]

Defendants admit that they must first establish coverage under the homeowners policy and that the umbrella policy is triggered only when damages are in excess of the primary homeowners policy limits. Defendants do not dispute that the umbrella policy cannot apply unless the homeowners policy is applied first; Defendants do not claim that there is an independent basis for application of the umbrella policy. Because the Court concludes that USAA has satisfied its burden of proving that the household exclusion defeats coverage under the primary policy, it also has implicitly decided that the umbrella could not have been triggered.

Second, the Court need not address whether Defendants are "insureds" under an alternative definition of that term as provided in the homeowners policy. The Court has determined that Defendants are residents of the grandparents' household under the grandparents' homeowners policy, and thus, the household exclusion defeats coverage. In light of this conclusion, even if Defendants were found to be "insured" under an alternative definition, they would, nevertheless, fall under the policy household exclusion so that they would be denied coverage.

Finally, a review of the parties' papers reveals that no dispute exists regarding the issue of waiver by USAA. In its complaint for declaratory judgment and opening and reply briefs, USAA asserts that it has not waived the applicability of the Coverage E exclusionary provisions by making a payment to Defendants under the MPO provision. Although Defendants indicated in their answer to USAA's complaint their belief that there had been waiver by USAA, Defendants did not pursue the argument in their opening brief. Indeed, in their reply brief, Defen-

---

11. The "Excess Coverage" provision of the umbrella policy provides:
> We provide excess liability protection for occurrences covered by primary insurance. We are responsible for the amount of loss above the limit of the applicable primary insurance up to the Policy limit. Payment of legal and loss expenses is in addition to the Policy limit. Umbrella Policy, p. 2.

dants state that "USAA erects another straw man by arguing that it did not waive applicability of the resident relative exclusion by making a payment under the 'MPO' coverage (footnote omitted). [Defendants] do not assert that USAA waives its right...." Also, Defendants state, "[Defendants] do not claim that USAA waived its rights by providing MPO coverage...." (Def. Reply Br. at 18 and 19). Rather, Defendants limit their argument to the proper interpretation of the household exclusion. Since the Court finds that no dispute exists regarding the issue of a potential waiver by USAA of the applicability of Coverage E exclusion by extending payment under the MPO provision, the Court will not address this argument.

## CONCLUSION

After considering all of the facts present in this case and the relevant case law, the Court concludes that, despite the stated intention of Defendants and the grandparents of a temporary living arrangement, the record supports a finding that Defendants were residents of the grandparents' household at the time of the accident. Thus, Defendants fall within the exclusionary clause of the grandparents' homeowners policy so that coverage under that policy is precluded. Therefore, Plaintiffs' Motion for Summary Judgment is **GRANTED**; Defendant's Motion for Summary Judgment is **DENIED**.

## MOTION FOR REARGUMENT

Defendants, Arden A. Engerbretsen, Deborah Engerbretsen, Andrew L. Engerbretsen, and Arden A. Engerbretsen, Jr., have moved this Court for reargument, pursuant to Super.Ct.Civ.R. 59(e), of the Court's decision of July 5, 1995 granting Plaintiffs', Arden B. Engerbretsen, Eleanor Engerbretsen, and United Service Automobile Association (USAA), motion for summary judgment and denying Defendants' motion for summary judgment.

The facts of this case are set out in detail in the Court's initial decision in this matter. *See Engerbretsen v. Engerbretsen*, Del.Super., 675 A.2d 13, Goldstein, J. (1995), Mem. Op. Briefly, this declaratory action concerns coverage under the grandparents' (Plaintiffs Arden B. and Eleanor Engerbretsen) homeowners insurance policy for an accident occurring at grandparents' premises. At the time of the accident, Defendants (grandparents' son and his wife and children) were staying with grandparents while the father looked for work. The accident occurred when the father accidentally backed over Andrew Engerbretsen with a riding tractor-mower.

The grandparents sought coverage under their homeowners policy and USAA denied coverage based on the exclusion of "residents of [the policyholder's] household" from coverage under the policy. Defendants and Plaintiffs filed cross motions for summary judgment, seeking determination of whether Andrew's injuries were covered under the grandparents' homeowners policy.

The Court determined that the phrase, "residents of [the policyholder's] household," as set forth in the grandparents' homeowners insurance policy, is unambiguous. *Id.* at 19. The Court adopted the definition of "residents of [the policyholder's] household," set forth in *Amco Ins. Co. v. Norton*, 243 Neb. 444, 500 N.W.2d 542 (1993) and the Delaware automobile insurance coverage cases, *Ellis v. Travelers Ins. Co.*, Del.Super., C.A. No. 93C–01–155, Babiarz, J. (Aug. 24, 1994) and *Jones v. Nationwide*, Del.Super., C.A. No. 90C–05–217, 1993 WL 189505, Del Pesco, J. (May 10, 1993). *Id.* at 19–20. The Court then held that Defendants were residents of the grandparents' household on the day of the accident. Therefore, Defendants were excluded from coverage under the policy. *Id.* at 23.

In support of their Motion for Reargument, Defendants argue, first, that the Court did not narrowly construe the phrase "residents of [the policyholder's] household," and that a narrow reading would have led to a different result. Had the exclusion been construed narrowly, Defendants argue, the intent of the policyholders would have been given greater weight. Plaintiffs respond that, even if the exclusion were to be construed even more narrowly than in the Court's original decision, the outcome of the analysis would not change since the Court, in

its initial decision, considered Defendants' stated intention for their stay at the grandparents' premises to be temporary along with other factors.

The Court stated in its original opinion, "the parties are bound by the plain meaning of the policy language." *Id.* at 17. If the policy is ambiguous, "the policy will be construed broadly to extend coverage and narrowly to exclude coverage." *Id.* The Court then found that the term, "residents of [the policyholder's] household" was unambiguous. As such, the Court was then bound to apply the plain meaning of the phrase.[12] The Court then used the factors set forth in *Norton* to determine that Defendants were residents of the grandparents' household and thus, were not entitled to payment under the policy.

The Court did not err in considering the stated intent of the parties as one of several factors to determine whether Defendants were residents of the grandparents' household. The Court found, in this case, that other factors outweighed the declared intention of the Defendants that their stay was merely temporary. *Id.* at 21. In short, the Court gave the proper weight to the parties' stated intention.

Defendants' second argument is that the Court failed to address USAA's acknowledgment of Defendants' temporary status as residents at the grandparents premises. Defendants argue that they "apparently failed to properly articulate their contention regarding USAA's knowledge that Defendants did not establish a permanent residence on the premises." In their original reply brief, Defendants pointed out that USAA, in a separate automobile insurance policy issued to Defendants, listed Defendants' former Holland, Pennsylvania residence as their principal residence and that the automobile policy applied Pennsylvania, rather than Delaware

law. Defendants argue that the import of USAA's knowledge, by its conduct in failing to change Defendants' address in the policy despite notification by Defendants of their new mailing address, is that Defendants had not established a residence in Delaware at the time of the accident. Defendants argue that, had USAA considered the grandparents' premises to be Defendants' residence, it would have issued the automobile policy pursuant to Delaware, not Pennsylvania law.

The Court also finds Defendants' second argument to be unpersuasive. The fact remains that Defendants no longer resided at the Holland, Pennsylvania residence at the time of the accident, and, in fact, had sold the Pennsylvania house. Their residence was that of the grandparents' premises. The mere fact that USAA had not changed the address listed in the policy and revised the policy accordingly by the date of the accident does not render this Court's previous decision invalid. The Court considered all the facts present in the case, including the fact that Defendants' address remained that of the Holland, Pennsylvania house in Defendants' automobile insurance policy with USAA. Given the strength of the other factors supporting the Court's finding that Defendants were residents of the grandparents' household, Defendants' second argument is insufficient to change the result in this case.

For the foregoing reasons, Defendants' Motion For Reargument of this Court's July 5, 1995 decision on Defendants' and Plaintiffs' cross-motions for summary judgment is **DENIED.**

---

12.  As noted above, the Court adopted the definition of "residents of [the policyholder's] household" set forth in *Norton, supra,* that is, "one who dwells or has an abode under the same roof as the named insured for a duration of sufficient length so that the occupiers can be said to compose a family." 500 N.W.2d at 546.